[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-14144
_____

D.C. Docket No. 1:12-cr-20757-JEM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

KAREN KALLEN-ZURY,
CHRISTIAN COLOMA,
DAISY MILLER,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(October 23, 2015)

Before WILLIAM PRYOR, JULIE CARNES and SILER,[*] Circuit Judges.

SILER, Circuit Judge:

A federal jury convicted four Florida mental-health-facility administrators of Medicare fraud and related charges. Three of them appeal. Karen Kallen-Zury, Christian Coloma, and Daisy Miller argue that prosecutorial misconduct and other errors denied them a fair trial. Kallen-Zury and Coloma also challenge their sentences. We AFFIRM.

## I. BACKGROUND

Kallen-Zury co-owned and operated Hollywood Pavilion (HP)—a mental health facility that included both in-patient and outpatient treatment programs— and a nursing home and rehabilitation center named Hollywood Hills (HH) on the same premises. Coloma was the director of rehabilitative services at HH. He worked closely with Kallen-Zury and Chris Gabel, who was the chief operating officer for HP and HH. Miller was clinical director of HP's inpatient facility. She worked most closely with Gabel and HP's psychiatric medical director Dr. Alan Gumer.

It is illegal for medical facilities that receive Medicare reimbursements to pay recruiters to bring them patients, but that is what HP did. The backbone of the

---

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

government's case was the testimony of several patient recruiters who pleaded guilty to Medicare fraud related to HP and other facilities. These included Keith Humes, Jean Luc Veraguas, Mathis Moore, Curtis Gates, and Gloria Himmons, who worked as a sub-recruiter under Humes.

These recruiters would find patients from as far away as Maryland. They would pay to have the patients ride buses down to HP in Hollywood, Florida. Most of the patients were drug addicts who did not need the psychiatric services offered at HP. Accordingly, the conspirators would often falsify the patients' records to reflect serious psychiatric problems.

Additionally, HP would only admit patients who had enough days on their Medicare plans to have their treatment periods paid for by the government. When the Medicare money ran out, the patients would be dismissed. Through this scheme, HP filed tens of millions of dollars in fraudulent claims to Medicare. Some of the recruiters also ran halfway houses and made extra money when HP referred discharged patients to those facilities.

The defendants' position was that they acted in good faith and believed the recruiters were providing lawful "marketing" services. They argued that HP's lawyers drafted the contracts with the recruiters and instructed HP's management how to ensure that their agreements with the recruiters fell within statutory and regulatory "safe harbor" provisions.

The court precluded the defendants from asserting an advice-of-counsel defense. The court also forbade counsel from presenting to the jury the substance of the safe harbor provisions. Accordingly, the defendants asserted a "good faith" defense. In light of this defense, the credibility of the defendants (each of whom testified) was paramount.

But the jury rejected this defense. It found Kallen-Zury, Coloma, and Miller guilty of all the charges against them, which included: conspiracy to commit health care fraud and wire fraud, 18 U.S.C. § 1349 (Kallen-Zury and Miller); wire fraud, 18 U.S.C. § 1343 (Kallen-Zury and Miller); health care fraud, 18 U.S.C. § 1347 (Kallen-Zury and Miller); conspiracy to defraud the United States and to pay and receive kickbacks in connection with a federal health-care benefit program, 18 U.S.C. § 371 (Kallen-Zury, Coloma, and Miller); and payment of kickbacks in connection with a federal health-care benefit program, 42 U.S.C. § 1320a-7b(b)(2)(A) (Kallen-Zury and Coloma).

The defendants have raised several issues. We will begin by addressing three allegations of prosecutorial misconduct.

## II.  THE FALSE EVIDENCE ISSUE

The lead investigator inaccurately testified that a key document—a digital scan of a handwritten patient register—was found on Kallen-Zury's office computer. (Doc 346 at 2985-86). The document was important for two reasons.

4

First, it was among a group of documents that HP failed to produce in response to an administrative subpoena.  Second, the register memorialized HP's methodology for tracking referrals.  Beginning in July 2005, when Kallen-Zury became head of HP after the death of her father, the register included a column that documented which recruiter referred each patient to HP.

In her testimony Kallen-Zury denied maintaining or possessing the register. (Doc. 348 at 3295-96, 3311-13).  The government in closing arguments used this contradiction to attack Kallen-Zury's credibility.  The prosecutor sarcastically called her "unlucky" for having such an important document on her computer without even knowing it.  (Doc 385 at 4039-41).

After trial, the government realized that the disc containing the register had been mislabeled by someone from the Department of Health and Human Services. Although the prosecutors and the lead investigator did not know it, agents had found the document on the computer of another HP employee.  (Doc 449 Ex. 1). Kallen-Zury moved for a new trial, but the district court denied the motion.  (Docs. 533-34).

Kallen-Zury argues that the lead investigator's inaccurate testimony violated her due-process right against the use of false evidence.  Because the inaccurate testimony undermined her credibility, she argues, it unfairly crippled her sole

5

defense, which was good faith.  Coloma and Miller argue that the spillover effect of this trial error unfairly contributed to the verdicts against them.

"[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  This principle—"that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction"—applies even when "the false testimony goes only to the credibility of the witness." *Id.*

Kallen-Zury claims that the lead investigator's testimony was conceptually similar to a *Giglio* error.  "To prevail on a *Giglio* claim, a petitioner must establish that (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material." *Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1334 (11th Cir. 2009) (quoting *Ford v. Hall*, 546 F.3d 1326, 1331-32 (11th Cir. 2008)).  "Pursuant to *Giglio*, false testimony is material if the false testimony could in any reasonable likelihood have affected the judgment of the jury." *Occhicone v. Crosby*, 455 F.3d 1306, 1309 (11th Cir. 2006) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)) (internal quotation marks and alterations omitted).  When a *Giglio* error occurs, we must vacate the conviction unless the government proves beyond a reasonable doubt that the error did not affect the verdict. *Id.* (citing *Chapman v. California*,

386 U.S. 18, 24 (1967)).  The materiality element of a *Giglio* claim is a question of law subject to *de novo* review.  *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1339 (11th Cir. 2011).[1]

At oral argument, Kallen-Zury's attorney conceded that the case agent's testimony was not a true *Giglio* error because neither the case agent nor the prosecutors knew the information was false.  The error was accidental, not intentional or perjurious.  And the government alerted Kallen-Zury as soon as it discovered the error after trial.  Furthermore, Kallen-Zury possessed the computer in question during her trial and could conceivably have discovered that the patient register was not on her hard drive.

In any event, Kallen-Zury's claim fails because the inaccurate testimony concerning the location of the patient register was not material to Kallen-Zury's case.  The mistake was not reasonably likely to affect the jury's judgment.

First, in the context of this massive five-week trial, the disagreement over the location of the patient register was picayune.  On redirect, Kallen-Zury

---

[1] The government asks us to scrutinize this false evidence issue using "the requirements for a new trial based on newly discovered evidence."  *See United States v. Scrushy*, 721 F.3d 1288, 1304-05 (11th Cir. 2013) (listing the four elements of a newly-discovered-evidence claim), *cert. denied*, 134 S. Ct. 1041 (2014).  But *Giglio* claims often involve testimony that was not discovered to be false until after trial.   In such cases, the claims need not clear the additional hurdle of the newly-discovered-evidence test.  *See, e.g.*, *Giglio*, 405 U.S. at 150-51 ("While appeal was pending . . . defense counsel discovered new evidence indicating that the Government had failed to disclose an alleged promise made to its key witness."); *United States v. Antone*, 603 F.2d 566, 567 (5th Cir. 1979) ("While appeals . . . were pending, . . . defendants were made aware of false testimony."); *Arnold v. McNeil*, 622 F. Supp. 2d 1294, 1297-98 (M.D. Fla. 2009) (testifying officer's corruption not known to parties during trial).

7

acknowledged that she knew about the patient register. She recalled it was kept in bound physical volumes dating back decades. (Doc. 348 at 3311-13). The only discrepancy between the lead investigator's testimony and Kallen-Zury's testimony was whether she kept the scanned electronic version of the register on her computer. This was a trivial point when Kallen-Zury clearly knew the location of the physical register and had the authority to control its content.

Second, any harm to Kallen-Zury's credibility over the location of the patient register was cumulative. The lead investigator's inadvertent false testimony was not some lone torpedo that singlehandedly sunk Kallen-Zury's good-faith defense. Kallen-Zury's testimony contradicted the testimony of several government witnesses on a number of points. Had the error never occurred, diverse other discrepancies between Kallen-Zury's testimony and the testimony of other witnesses (including three patient recruiters and two of Kallen-Zury's own employees) were sufficient to abnegate her credibility in the jurors' eyes. Because the misstatement was not material, there was no harmful error and no harmful spillover effect to Coloma and Miller.

## III. IMPROPER CLOSING ARGUMENTS

A prosecutor made statements during rebuttal closing that appear to accuse Coloma's counsel of foisting a fraud on the jury. Coloma's counsel did not object

until after trial. Coloma argues that this unfair traducement of his counsel warrants a new trial.

All three defendants lodge additional allegations of prosecutorial misconduct, including during closing arguments. We will aggregate these arguments—beginning with Coloma's key issue—in this section.

## A.

Coloma's bone of contention stems from the parties' mutual confusion regarding the information in two trial exhibits. One collective exhibit—Exhibit CC-C2—contained years' worth of invoices that patient recruiter Humes and his consulting company submitted to HP, along with some related bank account statements that the parties refer to as "summaries." The invoices included handwritten annotations by Coloma and were accompanied by receipts from Coloma memorializing the checks HP paid to Humes. The government provided these documents to Coloma before trial. Coloma submitted them as a trial exhibit. Coloma and Humes testified about documents in this collective exhibit. So did the defense expert witness Ronald Wise, a former IRS agent.

While Wise was testifying on behalf of Kallen-Zury, Coloma's counsel gave the government a related demonstrative exhibit—Exhibit CC-K1. Exhibit CC-K1 contains charts that Coloma's counsel's law firm created in conjunction with Wise.

The CC-K1 charts were designed to cast doubt on the government's theory that HP had a formula for reimbursing patient recruiters per patient:  HP would pay $300 for each inpatient and $100 for each outpatient.  Humes explained this arrangement during his testimony.  (Doc 303 at 532-43).  He claimed HP's management instructed the recruiters to vary the amount on their invoices to keep the illegality hidden, but to ensure that the invoices still added up correctly:  $300 per inpatient plus $100 per outpatient.  The CC-K1 charts culled data from collective exhibit CC-C2, the patient register, and the census reports.  Wise tried to use these charts to show that the government's pay-per-patient theory did not jibe with the existing documentation.

Before trial, the government also obtained Humes's *actual* bank records and shared them with the defense.  They differ from Humes's "summaries" that are found in the collective exhibit.  The government offered the bank statements into evidence during Humes's testimony.

Humes falsified some of the information in his invoices to HP.  Humes testified that he made false expense claims and that in 2008 Gabel instructed him to "redo" some of his old invoices to better hide the fraud conspiracy.  (Doc 303 at 540, 545-49, 555-56).

Although Humes made clear in his testimony that the *invoices* were inaccurate, he never testified that the bank "summaries" in the collective exhibit

10

were also falsified.  In fact, unbeknownst to Coloma's attorneys, Humes had altered them, too.  Thus, when Wise relied on Humes's bank "summaries" to prepare his charts, Wise was basing his calculations on fraudulent documents.

This brings us to Coloma's counsel's closing arguments.  Counsel discussed invoices and bank summaries from the collective exhibit and called them "actual supporting documentation" that no one had alleged to be fraudulent.  Counsel urged the jury to study a particular invoice and observe how it matched up with its accompanying bank account summary.  Doing so, counsel suggested, would show that Humes's invoices were not "shams" or "fabrications," and should give the jury reasonable doubt.  (Doc 386 at 4190-91).

In rebuttal the next morning, the government castigated Coloma's attorney for relying on the bank summaries:

> In his closing, [Coloma's counsel] raised a couple of matters that need to be addressed.  [He] showed you a marketing invoice from Keith Humes from January 2008.  And he showed you a copy of Keith Humes' bank statement from January 2008. . . .
> The Government agrees . . . that the bank statement on the left and the invoice on the right have charges and expenses that are consistent with one another.  But members of the jury, there is a giant, giant problem with this. . . .
> [T]he actual bank statement from Keith Humes for that month [shows] something completely different.  It doesn't match the invoice.  The document [Coloma's counsel] showed you was a fake bank statement. . . . *This fraud happened right in front of your eyes in court here yesterday*.  (Doc 387 at 1255-56 emphasis added).

The prosecutor then addressed the CC-K1 charts:

11

But the truth is those charts, they weren't even created by Mr. Wise. The Government received those charts, as you heard, at the exact same time Mr. Wise was on the stand. The charts were created by Mr. Gainor and his law firm. The charts make no sense, we invite you to look at them, they're not accurate, they're a sham. Just like the invoices, just like the bank statement. (Doc 387 at 1258).

After trial, Coloma moved for a new trial based on these "fraud" remarks. At the hearing on the motion, it became clear that the attorneys *on both sides* failed to realize that Humes had falsified the bank "summaries" like he did the invoices. Although Humes's real bank statements were in evidence and in the parties' possession, the attorneys had not compared the real statements to the fake "summaries" to discover that they did not match. The government only discovered this truth after Coloma's closing arguments. When the prosecutor "realized [Coloma's] entire closing statement was based on a forged document," he explained to the district court, he "pointed out to the jury that a fake document had been used and the results were obvious." (Doc 635 at 56-57).

We will introduce the other allegations of prosecutorial misconduct later in this section.

**B.**

The goal of the prosecutor is not to win the case, but to ensure "that justice shall be done." While the prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). "Improper suggestions, insinuations, and assertions calculated to mislead or inflame the jury's

passions are forbidden in the presentation of closing arguments." *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009).

> To establish prosecutorial misconduct:  (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant. A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different. When the record contains sufficient independent evidence of guilt, any error is harmless.

*Id*. (quoting *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006)).

We review a prosecutorial misconduct claim *de novo* because it is a mixed question of law and fact. *Eckhardt*, 466 F.3d at 947.  But if the defendant did not object at trial, review is for plain error only.  *See* Fed. R. Crim. P. 52(b).  When the misconduct is subject to plain error review, reversal is warranted only when the misconduct is "so pronounced and persistent that it permeates the entire atmosphere of the trial." *United States v. Crutchfield*, 26 F.3d 1098, 1099 (11th Cir. 1994) (quoting *United States v. McLain*, 823 F.2d 1457, 1462 (11th Cir. 1987)).

For non-plain error cases, courts look to several factors to determine whether the cumulative effect of prosecutorial misdeeds had a "reasonable probability" of affecting the trial's outcome.  These include:  (1) the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether they are isolated or extensive; (3) whether they were

deliberately or accidentally placed before the jury; and (4) the strength of the competent proof to establish the guilt of the accused. *United States v. Feliciano*, 761 F.3d 1202, 1211 (11th Cir. 2014); *Davis v. Zant*, 36 F.3d 1538, 1546, 1549 (11th Cir. 1994). "Prosecutorial misconduct must be considered in the context of the entire trial, along with any curative instruction." *Lopez*, 590 F.3d at 1256. "[P]rosecutorial misconduct is least acceptable under the Constitution when aimed at the core of the defense's case." *Davis*, 36 F.3d at 1550 n.17.

"[I]t is improper for a prosecutor to use misstatements and falsehoods." *Davis*, 36 F.3d at 1548; *see also Berger*, 295 U.S. at 84-85; ABA Standards for Criminal Justice § 3-6.8(a). When the prosecutor paints for the jury "a distorted picture of the realities of [the] case in order to secure a conviction," this violates the "fundamental tenet" that "attorneys may not make material misstatements of fact in summation." *Davis*, 36 F.3d at 1548 n.15, 1549.

It is also forbidden to attack the character of defense counsel. In *McLain*, the prosecutor "made critical remarks about the character of [defense] counsel," including repeatedly accusing him of "intentionally misleading the jurors and witnesses and of lying in court." 823 F.2d at 1462. We explained that opposing counsel "is entitled to courtesy and respect":

> To discredit defense counsel in front of the jury is improper, and even subsequent jury instructions aimed at rectifying this error may not ensure that these disparaging remarks have not already deprived the

14

defendant of a fair trial. . . . Such remarks are plain error as they affect substantial rights of the defendant.

*Id*. We reversed under plain error review even though the prosecutorial misconduct was not "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial." *Id*. Instead, we relied on the cumulative effect of prosecutorial misconduct and judicial errors during closing arguments. *Id.* at 1462-63.

In *Davis v. Zant*, we granted habeas relief on similar grounds. Among other errors, the prosecutor alleged at closing argument that the defense theory was "hogwash" and a last-minute fabrication, despite having known the defense strategy six months before trial. 36 F.3d at 1547. The prosecutor also made "disparaging and egregious" comments during "a rambling and highly improper commentary on the defense management of the trial." *Id*.

Prosecutorial comments that would otherwise be improper may be harmless if they were invited by defense counsel and offered as a fair response. *Lopez*, 590 F.3d at 1256; *United States v. Stefan*, 784 F.2d 1093, 1100 (11th Cir. 1986).

## C.

We first turn to the argument of Coloma (joined by Kallen-Zury) that the government improperly accused his counsel of perpetrating a fraud on the jury. In this case, the prosecutor went too far. Instead of telling the jury, "This fraud happened right in front of your eyes in court here yesterday" and calling the charts

15

a "sham," it would have been better for the prosecutor to simply point out that Coloma's counsel and expert witness had relied on documents that were falsified by Humes.

Nevertheless, because none of the defendants objected to the prosecutor's "fraud" accusation, we may review it only for plain error. We may only reverse if the misconduct was "so pronounced and persistent that it permeated the entire atmosphere of the trial." *United States v. Mueller*, 74 F.3d 1152, 1157 (11th Cir. 1996). As we will explain shortly, this was not the case. Although misconduct occurred, it did not rise to the level of *McLain* and *Davis*. "[This] trial was not perfect—few are—but neither was it fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168, 183 (1986).

Furthermore, the challenged statements were given largely in response to Coloma's closing argument, which repeatedly accused the government of misstating the evidence. Like the misconduct in *Stefan*, any potential harm "was mitigated by the jury's understanding that the prosecution was countering defense counsel's repeated attacks on the prosecution's integrity and the defense counsel's argument that the evidence established no [such] crime." 784 F.2d at 1100 (quoting *United States v. Young*, 470 U.S. 1, 17-18 (1985)); *see also Darden*, 477 U.S. at 182 (declining to reverse for prosecutorial misconduct during closing

arguments when "[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense").

## D.

The defendants point to other improper statements from the government's closing arguments, including direct comments on the guilt and credibility of the witnesses.

## 1.

First, the defendants argue that the opening lines of the government's closing arguments were unnecessarily inflammatory and misstated evidence.  Here is how the government's closing argument began:

> Henry McCullouch. Henry McCullouch, a Vietnam veteran, a diabetic drug addict, rode for 24 hours from Shreveport, Louisiana, to come to Hollywood Pavilion. He had Medicare with plenty of days left, so he was promptly admitted. He was rushed to the emergency room three times with chest pains in the span of nine days. When he went back to Hollywood Pavilion, he was put on a bus and sent back to Louisiana with a sack lunch.  In diapers.
> Henry McCullouch was sent to Hollywood Pavilion by Gloria Himmons, a patient recruiter who was paid $271,000, paid by the defendant, Karen Kallen-Zury.  Henry McCullouch was kicked to the curb by Daisy Miller, who knew that a doctor at HP had tried to shred a document in his patient file that falsified McCullouch's treatment. And why?  So that HP could bill Medicare for McCullouch's treatment for $9,000.  (Doc. 385 at 4015).

The defendants aver they were charged with defrauding Medicare, not with mistreating patients.  They argue it was improper for the government to place so

17

much emphasis on inflammatory "other act" evidence that was admitted under Fed. R. Evid. 404(b) for the limited purpose of establishing the defendants' intent.

The defendants also claim the prosecutor mischaracterized the evidence regarding McCullouch. First, Miller testified that McCullouch was never sent home in a diaper. Instead, he was transferred from HP to Memorial Hospital, and discharged from there. No other witness contradicted this testimony. (Miller Br. at 37; Doc. 381 at 3480-81). Second, the former employee who testified about salvaging McCullouch's patient notes from a shred-box made no allegation that the patient notes had "falsified McCullouch's treatment." (Doc 385 at 2854-57; Miller Reply Br. at 9). Perhaps a juror could infer that something was fishy about the patient notes, but there was no testimony suggesting they were fraudulent.

However, the defendants made no contemporaneous objections to these statements. And Miller's counsel in closing arguments emphasized evidence in the record that contradicted the government's account of McCullouch's treatment. (Doc 386 at 4141). The government was free to recite and interpret any evidence it wished, the defendants were free to proffer their own interpretations, and the jury was free to decide whom to believe. There was no error here.

The government continued this theme—that HP exploited vulnerable victims—later in closing arguments:

> But the crimes you have heard about in this courtroom are far from limited to lying, cheating, and stealing. As [we previously said

18

in our first closing argument], the way the scheme worked at rock bottom was by using people, human beings. The patient recruiters sold them, these defendants bought them.

\*\*\*\*

Real people who are locked into a psychiatric hospital for weeks at a time so that Karen Kallen-Zury could bill Medicare for millions of dollars. Real people who are overmedicated with psychotropic medications to justify their admission and their length of stay. Real people who are discharged to filth, the patient recruiters homes you heard about, homes where they lived in squalor, sometimes without electricity, sometimes without water.

It's about real people, one person who had three cardiac episodes, was discharged to a bus station, rode home on a bus traveling three states with a sack lunch and in a diaper. A real person, Jamie Rockman, who almost died at Hollywood Pavilion, almost died because of an eating disorder, but who Karen Kallen-Zury and Daisy Miller yelled at Marcia Starkman to keep, keep her here. Don't discharge her.

What happened at Hollywood Pavilion to these people is despicable. It's subhuman, and at times it was savage. (Doc 387 at 4250-51).

Later, the government also said, "What [the patients] found at Hollywood Pavilion was a boiler room, a brothel of fraud where Kallen-Zury's greed was paramount, and where the needs of the patients [were] insignificant." (Doc 385 at 4072).

The defendants argue that the government's statement, "the crimes you have heard about in this courtroom are far from limited to lying, cheating, and stealing," improperly accused them of uncharged conduct. Taken in context, however, the

19

government was simply stating its theme—that the defendants' Medicare fraud scheme caused HP's patients to suffer. The remarks were not improper.

The defendants also argue the government crossed a line when it called their actions "despicable," "subhuman," and "savage." The defendants tell us the recruiters were the ones responsible for the conditions at the halfway houses. And, in any event, no eyewitness to the halfway houses testified about their conditions. All we have from the trial record is a former HP employee who testified that patients complained about the halfway houses, but that Miller told her that the patients were merely disgruntled.

Again, the court admitted the evidence concerning McCullouch, the two other patients, and the halfway houses as circumstantial evidence that the defendants valued Medicare payments over the health and comfort of their patients. As such, the evidence was available for use in closing arguments. We cannot say that by vigorously pursuing its theme, the government committed misconduct.

**2.**

The government in closing told the jury that Coloma had lied on the stand:

> We've talked about Mr. Coloma meeting with recruiters, we've talked about his review of the invoices. Ladies and gentlemen, we submit the most incriminating evidence against Christian Coloma comes from his own testimony. He took that stand, he swore to tell the truth, and then he spent four plus hours making stuff up.

20

We were all in the same room. We know what it looks like when someone is lying, evasive body language, the body language, the answers, the answers that he shaped and sculpted to every single fact and every single question.  Even in the face of documents that blatantly contradicted his testimony.

Ladies and gentlemen, he lied and he lied repeatedly.  He lied about documents he claimed to have seen years ago.  He lied about when he stopped seeing invoices.  He lied about Diane Revels writing out of the blue sending him a letter for a job that only had his first name on it and was addressed to the wrong company.  Most importantly, he lied about his involvement in the fraud.  Why?  To mislead this jury and to conceal his guilt.  (Doc 385 at 4047-48).

The same assertions appeared in rebuttal:

Almost all of [Coloma's testimony] was a complete concocted [sic], a farce and a lie.  It had to be.  That's because his only job at Hollywood Pavilion was to cover it up and pay bribes.  (Doc 387 at 4258).

****

Within five minutes of cross-examination, you had learned that he lied about seeing a certificate in Tiffany Coleman's office.  Coloma said he saw it in August 2004.  The license wasn't issued until January 2005.  His explanation for the discrepancy made no sense.  He rambled.  His tone completely changed, he stumbled over his words and at that point in time, you knew, like everybody in the courtroom knew, his story was a giant lie.  (Doc 387 at 4260).

"It is improper for a prosecutor to directly convey his personal beliefs about a defendant's credibility in closing argument."  *Mueller*, 74 F.3d at 1157.  This was done to Coloma when the prosecutor called his testimony a "concocted . . . farce and a lie," and said, "Ladies and gentlemen, he lied and he lied repeatedly."  The statements in this case ("He lied about [X, Y, Z]") are strikingly similar to the

21

misconduct in *Mueller*. *See id*. But Coloma made no contemporaneous objections to these statements. And they were tempered by how the prosecutor pointed to specific reasons the jury might determine Coloma was lying. Accordingly, although they were improper, the comments did not infect the trial to such an extent it was rendered unfair.

**3.**

During rebuttal argument, the government also addressed the fact that its own key witnesses, the patient recruiters, were criminals:

> The United States would love nothing more than to call Mother Theresa in this case, ten Mother Theresas. But Mother Theresa doesn't commit fraud and Mother Theresa didn't work at Hollywood Pavilion.
> But here's who did work at Hollywood Pavilion. At least seven convicted felons. . . .
>
> ****
>
> You are the company you keep. And you heard exactly who the defendants associated with in this case. Criminals. Criminals work with criminals. And that's exactly what happened at Hollywood Pavilion. (Doc 387 at 4252-53).

A prosecutor may not call a defendant a criminal or otherwise cast direct aspersions on a defendant's character. *United States v. Blakey*, 14 F.3d 1557, 1559-60 (11th Cir. 1994). The prosecutor's statements about how "criminals work with criminals" may have begun as an answer to the defendants' arguments attacking the credibility of the recruiter-witnesses. But ultimately these words

22

identify the defendants as "criminals." The defendants made no contemporaneous objection.

To establish prosecutorial misconduct during closing arguments: (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant. *Lopez*, 590 F.3d at 1256. Having found that some of the government's statements during closing arguments were improper, we must consider whether, under plain error review, the misconduct was so pronounced and persistent that it permeated the entire atmosphere of the trial. *Mueller*, 74 F.3d at 1157.

The improprieties were not so pervasive. In the context of this five-week trial and three hours of government closing arguments, the improper statements were relatively isolated and did not affect the atmosphere of the trial. This is especially true because the defendants all testified and argued to the jury their own version of events and their own interpretation of the government's evidence. Despite the defendants' testimony, the government's evidence establishing the fraud conspiracy was strong. Accordingly, any misconduct that occurred during closing arguments was not so egregious as to deny the defendants a fair trial.

## IV.  OTHER ISSUES

The defendants also raise the following allegations—mostly of evidentiary error or prosecutorial misconduct.

23

**1.**

The defendants decry the admission of press releases and news articles related to other Medicare fraud investigations that were found in Kallen-Zury's office or exchanged among the defendants through email. (Miller Br. at 53, 73-74). The government argued to the jury that the defendants collected and exchanged these news reports because they were afraid their own fraud conspiracy would soon be exposed. The defendants argued that collecting these news stories was not inculpatory—the stories would be of interest to anyone in their field.

Because the press releases and news reports were at least minimally probative of the defendants' intent, they were relevant. Nor were they unduly prejudicial, especially when the defendants proffered their own explanation for collecting them. The court did not err in admitting them.

**2.**

The defendants allege that a prosecutor committed misconduct while questioning Humes and Moore—two of the patient recruiters who testified for the government.

When Humes testified, the prosecutor asked:

Q. Mr. Humes, did you ever work with or for a place called Hollywood Pavilion?
A. Yes, I did.
. . . .
Q. Sir, did you commit crimes while you were working there?
A. Yes, I did.

24

Q. What did you do?
A. Recruited patients.
. . . .
Q. What did you get for it?
A. I got money.
Q. Did you commit these crimes along with anyone else here in this courtroom today?
A. Yes, I did.
Q. Who?
    [KALLEN-ZURY'S ATTORNEY]: Objection, Your Honor. Calls for opinion.
THE COURT: Yeah, I'll sustain that. You can ask him what he did and with whom, but you can't ask him whether he committed a crime. That's for somebody else to decide.

Humes then identified the defendants as people he worked with at HP.

He testified that he was a "patient recruiter," meaning "[a] person that goes

out and gets Medicare patients [for] [m]oney."

Q. Is there anything wrong with that?
A. Yes, it is.
Q. What's wrong with it?
A. It's illegal.
Q. And did you do that for HP?
A. Yes, I did.
. . . .
Q. In your mind, did you think you were breaking the law the whole time?
A. I knew I was.  (Doc 298 at 448).

Similarly, when patient recruiter Moore took the stand, the first line of

questioning encapsulated the government's theory and contained a legal conclusion

that the defendants had committed fraud:

Q. What did you do with Hollywood Pavilion?
A. I sent clients there for money.

25

Q. Did you commit fraud through your work with Hollywood Pavilion?

A. Yes, I did.

Q. What was the fraud that you committed?

A. Getting paid for clients.

Q. Who at Hollywood Pavilion did you work with?

A. Daisy.

. . . .

Q. In a sentence, what did you and Daisy do?

A. Set up a meeting to talk about how many clients could I send to Hollywood Pavilion inpatient.

Q. Who else did you work with at Hollywood Pavilion?

A. Karen.

. . . .

Q. In a sentence, what did you and Karen do?

A. Talk about how I would be paid without them being in any kind of problems.

Q. Who else at Hollywood Pavilion?

. . . .

A. Christ[ian], I believe.

Q. And what did you and Christ[ian] do?

A. Talked about how much I'm going to get paid monthly, and what he wanted to fill out for a report to look like that it was real for marketing. (Doc 334 at 2423-25).

Prosecutors should not solicit testimony that expresses the legal conclusion that a defendant was guilty. *See, e.g.*, *United States v. Massino*, 546 F.3d 123, 129-30 (2d Cir. 2008) (finding harmless error when a co-conspirator opined that defendants were guilty). This occurred with Humes when the prosecutor asked who he "committed these crimes with." But the court sustained an objection to the question. During the rest of this testimony, Humes and Moore were describing *themselves* as criminals and describing their interactions with the defendants

26

without explicitly calling them criminals as well.  The only error here was cured by a sustained objection.

**3.**

Kallen-Zury and Coloma object to the government's telling the jury that Kallen-Zury paid Coloma's legal fees when, in fact, it was Kallen-Zury's mother who did so.

The government obtained the court's approval to ask Coloma about Kallen-Zury's mother's paying his legal fees.  Then the following questioning occurred:

> Q. Sir, you are close with the Kallen-Zury family, correct?
> A. Yes, at work.
> Q. And your relationship with . . . Karen Kallen-Zury, goes back to 1988 when she hired you, right?
> A. Karen Kallen-Zury hired me in . . . May 1999.
> Q. Thank you, May 1999. You have a relationship with her father too, you did prior to his passing, correct?
> A. Yes.
> Q. You also helped take care of Ms. Kallen's mother Lenor Kallen, right?
> A. Yes.
> Q. You are not paying your attorneys' fees, are you?
> A. Half of them.
> Q. The Kallen family is paying the other half of your attorneys' fees, correct?
> A. Mr. Kallen [sic] paid half of the attorneys' fees.
> [COLOMA'S ATTORNEY]: I will object for the record to this line of questioning . . . .
> THE COURT: Overruled.  (Doc 363 at 3816-17).

During rebuttal arguments, the prosecutor described Coloma as "Kallen-Zury's henchman" who "did her bidding."  The prosecutor said that Kallen-Zury

27

trusted him "to keep their crimes secret. And for his participation and his silence, he was paid handsomely. Karen Kallen-Zury is even paying for some of his attorney's fees here today." (Doc 387 at 4259).

Coloma's counsel objected and said, "That is offensive, that payment came from [Kallen-Zury's mother], not Karen Kallen-Zury." The court overruled the objection and explained that the jury was "well aware" of the prior testimony on this point and that they would be "the final arbiters." (Doc. 387 at 4259).

The defendants do not object to the admissibility of this information, only to the government's inference that Kallen-Zury was involved in the arrangement between Coloma and her mother. Even if it was improper for the government to make explicit the inference that Kallen-Zury paid Coloma's legal fees at Kallen-Zury's behest, the district court cured any error by reminding the jury of the prior testimony and instructing them to assess the evidence themselves.

### 4.

Kallen-Zury and Coloma challenge the court's decision to exclude their safe-harbor defense and the court's refusal to instruct the jury on the safe-harbor regulations. (KZ Br. 32-37). They cite their constitutional guarantee of "a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).

28

But the district court very carefully limited the scope of the defendants' arguments because the defendants' circumstances did not satisfy the elements of an advice-of-counsel defense. Instead, the court allowed the defendants to argue a good faith defense. The advice letters from HP's former counsel were in evidence, and Kallen-Zury testified that she had followed the letters. The jury had enough information to connect the dots between these letters, the safe harbor provisions described in the letters, and the defendants' alleged good faith. The court did not deprive the defendants of their right to a defense.

**5.**

Coloma argues that the prosecution improperly used "class bias" against him. (Coloma Br. 20, 32). In closing arguments, the government said he was "paid handsomely." Coloma received a car and "got all the money," the government said, because Kallen-Zury could trust him "not to run to the police." (Doc 387 at 4259). The court had previously cautioned the government against using Coloma's salary to "prejudice . . . the minds of the jury." (Doc. 312 at 1325). But remuneration can be relevant to motive. In the absence of a contemporaneous objection, we find no plain error here.

**6.**

Coloma claims the trial judge prejudiced him by making "gratuitous comments." (Coloma Br. 21). First, when Coloma (who is not a native English

29

speaker) was testifying, he had difficulty understanding the word "outlandish."

The judge suggested "ridiculous" as a synonym. (Doc 363 at 2851-52). Coloma

argues that in effect the judge was calling Coloma's testimony ridiculous. In

context, we doubt the jury understood it that way. We find no error.

Second, during Coloma's cross-examination, the following exchange

occurred:

> Q. Sir, you changed patients' names on invoices, correct?
> A. Correct.
> Q. You changed the names because the invoice was just a coverup for which patient was being sent by the person sending the invoice, right?
> A. Absolutely not. And I can explain to you why.
> Q. And if a particular patient—
> [COLOMA'S ATTORNEY]: If the witness can explain?
> THE COURT: How can that be explained? That's not an explanation. That's an answer, yes or no. No. Move on.

Coloma argues the judge was indicating that Coloma had no legitimate

explanation for his behavior. But in context, the judge was simply observing that

"absolutely not" is a complete answer to the question being asked. In any event,

Coloma had an opportunity to provide an explanation during redirect. The judge's

interjection was innocuous.

### 7.

Miller claims the district court erred by denying her motion to sever her trial

from the trial of her codefendants. (Miller Br. 66-67).

> We undertake a two-step analysis to determine whether separate charges were properly tried at the same time. We first review *de novo*

whether counts were properly joined in one indictment under Federal Rule of Criminal Procedure 8(a).  We then review the denial of a motion to sever under Federal Rule of Criminal Procedure 14 for abuse of discretion.

*United States v. Barsoum*, 763 F.3d 1321, 1336 (11th Cir. 2014) (internal citations and quotation marks omitted), *cert. denied*, 135 S. Ct. 1883 (2015).  First,

> Joinder of offenses is proper where they "are of the same or similar character . . . or are connected with or constitute parts of a common scheme or plan."  Fed. R. Crim. P. 8(a).  We construe this requirement broadly, in favor of initial joinder.  We look only to the allegations stated on the face of the indictment to make our determination.

*Id*. at 1336-37 (citations omitted).  We will reverse a denial of a motion to sever only if the defendant demonstrates that she "received an unfair trial and suffered compelling prejudice."  This is a "heavy burden [that] mere conclusory allegations cannot carry."  *Id*. (internal citations omitted).

In this conspiracy case, the indictment alleged a common scheme or plan.  Although Miller argues she was a victim of guilt by association, her protestations do not convince us that her trial was unfair or that she suffered compelling prejudice by not being tried separately from her codefendants.  The district court was within its discretion to deny her severance motion.

**8.**

Miller argues it was improper for the prosecution to comment on the fact that her immediate supervisor, Dr. Gabel, was not present at trial.  (Miller Br. 43-

31

44).  Gabel, who was running HP at the time of trial, had retained counsel and refused to testify.  (Miler Br. 43-44).

Miller testified on direct examination that she had become concerned about the conditions of the halfway houses.  She said she took her concerns to Gabel, who was in charge of regulatory issues.  According to Miller, Gabel told her that HP's attorneys were on top of things.  A government witness who was a former HP employee previously gave similar testimony.  During Miller's cross-examination the following exchange occurred:

> Q. You testified about Chris Gabel.  Do you blame him for the fraud that occurred at Hollywood Pavilion?
> A. I do not blame anyone because there was no fraud.
> Q. You heard Ms. Kallen-Zury testify and her attorney also talk about Mr. Gabel and his responsibilities too, correct?
> A. Yes.
> Q. And Mr. Gabel was between you and Mrs. Kallen-Zury in the hierarchy, right?
> A. That is correct.
> Q. Would you agree that it's convenient that both of you have been focused on the responsibilities of someone who is not here in the courtroom? (Doc 381 at 3511-12).

Kallen-Zury's attorney objected to the question.  The objection was sustained "as to the form of the question," and Kallen-Zury's attorney reserved a motion for a mistrial, which was later denied.  Miller now insists this line of questioning constituted highly prejudicial "innuendo" that "caused the jury to speculate as to why Gabel did not testify."  (Miller Br. 43).  Miller asseverates there was "only one logical inference" the jury could draw from the question about

32

Gabel's absence: "Gabel did not testify at trial because his testimony would not corroborate Miller's testimony." (*Id.*).

Assuming the question was improper, the court sustained the objection, thus diminishing the harm. Contrary to Miller's assertion, a jury could imagine various reasons why a potential witness might not testify, and the government never exploited this "innuendo" during closing arguments. Under these circumstances, the prejudicial effect was unlikely to influence the verdict. *See* Fed. R. Crim. P. 52(a).

**9.**

Miller objects to how the prosecution cross-examined her by having her read previously-admitted exhibits. (Miller Br. 44-45). At one point, the prosecutor was simply reading documents he believed were inconsistent with Miller's testimony. The defendants objected, and the court sustained the objection. (Doc 381 at 3526). Asking a witness to read and comment on previously-admitted exhibits is not error.

**10.**

In various other ways Miller accuses the government of "a conscious pattern of misconduct." She complains that the prosecutor, during cross-examination, misstated her prior testimony to make her look like a liar, asked loaded questions, and asked questions involving facts not in evidence. (Miller Br. 45-50). While the prosecutor's questions may have been "hard blows," we cannot say from the record

33

that they were foul blows. *Berger*, 295 U.S. at 88. Miller was able to tell her side of the story and argue it to the jury.

## 11.

Finally, the defendants posit that cumulative error denied them a fair trial. "An aggregation of [harmless errors] can yield a denial of the constitutional right to a fair trial, which calls for reversal." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). The first error was the lead case agent's inaccurate testimony that a patient register was found on Kallen-Zury's computer. But we have already decided that error was not material. We have considered Coloma's chief allegation of error—the government's statement suggesting that his counsel had foisted a fraud on the jury—and found that it was largely an invited error. We also found that aspects of the government's closing arguments—calling Coloma a liar and calling the defendants criminals—were improper but not so prejudicial as to surmount plain error review. It was also improper for the prosecution to comment that it was "convenient" for Miller and Kallen-Zury that Gabel did not testify. But that error, which resulted in a sustained objection, was harmless under the circumstances. In light of the trial as a whole, even when these errors are aggregated they do not amount to a denial of the constitutional right to a fair trial.

## V.  SENTENCING

Kallen-Zury and Coloma challenge aspects of their sentences.

34

## A.

Kallen-Zury argues her sentence is so cyclopean it violates the Constitution.

Kallen-Zury's presentence report noted that her scheme caused $67 million in fraudulent claims to be submitted to Medicare, and that she personally netted over $10 million as a result. The report assigned her a base offense level of seven, USSG § 2B1.1(a)(1), plus a twenty-four-level increase because the amount she intended to pilfer was between fifty and 100 million dollars, § 2B1.1(b)(1)(M). Additionally, the court imposed a two-level enhancement for committing the offense through mass marketing, § 2B1.1(b)(2)(A)(ii); a four-level enhancement for defrauding a government health-care program of over $20 million, § 2B1.1(b)(7)(A), (B)(iii); a two-level enhancement for using sophisticated means, § 2B1.1(b)(10)(c); a two-level enhancement for knowing the scheme would have vulnerable victims, § 3A1.1(b)(1); a two-level enhancement for having a large number of vulnerable victims, § 3A1.1(b)(2); and a four-level enhancement as a leader of an extensive criminal enterprise, § 3B1.1(a). Given her criminal history category of I, this resulted in a total offense level of 47, for a Guidelines sentence of life imprisonment. But by operation of USSG §§ 5G1.1(a) and 5G1.2(d), this range was converted to an advisory Guidelines sentence of 170 years.

35

Kallen-Zury argued for a sentence of home confinement. The government asked for a 40-year sentence. The district court imposed a 25-year sentence of imprisonment.

Kallen-Zury claims her sentence is excessive under the Eighth Amendment's prohibition on cruel and unusual punishments. She argues that, as a 61-year-old woman with no criminal history whose crimes were not violent, her 25-year sentence is unconstitutionally excessive. Kallen-Zury did not present this Eighth Amendment issue to the district court, so we may review it only for plain error. *United States v. Flanders*, 752 F.3d 1317, 1342 (11th Cir. 2014), *cert. denied*, 135 S. Ct. 1188 (2015).

As a matter of principle under the Eighth Amendment, "a criminal sentence must be proportionate to the crime." *Solem v. Helm*, 463 U.S. 277, 290 (1983). "Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals." *Id*.

The first question for a reviewing court is whether the sentence is grossly disproportionate to the offense. If it is, then we compare it to the sentences of other offenders. *United States v. Reynolds*, 215 F.3d 1210, 1214 (11th Cir. 2000) (citing *United States v. Brant*, 62 F.3d 367, 368 (11th Cir. 1995)).

36

To the best of our knowledge, we have never found a term of imprisonment to violate the Eighth Amendment.  Granting the appropriate deference to Congress, the Sentencing Commission, and the district court, we cannot say that Kallen-Zury's below-Guidelines sentence was so grossly disproportionate to her crimes that it was plainly unconstitutional.

**B.**

Coloma challenges (1) the monetary loss amount the district court attributed to him and (2) the district court's application of the vulnerable victim enhancements.

**1.**

Coloma's presentence report noted that, as the go-between for Kallen-Zury and the patient recruiters, Coloma caused over \$32 million in fraudulent claims to be submitted to Medicare, over \$20 million of which Medicare paid to HP. Accordingly, the report assigned him a base offense level of eight, USSG § 2B4.1(a), plus a 22-level enhancement under § 2B1.1(b)(1)(L) because the improper benefit was between twenty and fifty million dollars.  The government also sought a two-level enhancement for knowing that the scheme would have vulnerable victims, § 3A1.1(b)(1); a two-level enhancement for having a large number of vulnerable victims, § 3A1.1(b)(2); a three-level enhancement for having a managerial role in the conspiracy, § 3B1.1(b); and a two-level enhancement for

37

obstruction of justice, § 3C1.1.  Factoring his criminal history category of I, this gave Coloma a total offense level of 39 and a Guidelines range of 262 to 327 months' imprisonment.

Coloma raised numerous objections at sentencing, and the district court granted his objection to the obstruction-of-justice enhancement.  This reduced his Guidelines range to 210 to 262 months' imprisonment.  The district court varied downward and imposed a 144-month sentence.  Coloma raises two challenges to his sentence on appeal.

First, Coloma challenges the district court's calculation of the loss amount attributable to him—$20,141,344.  Coloma argues that no evidence suggested he filed a single Medicare claim for HP.  Instead, he claims the appropriate amount would be $592,732—the amount he paid in kickbacks to the recruiters whose invoices he personally reviewed.  Alternatively, he argues that even if his loss amount should include payments made by Medicare to HP, the court should subtract the payments associated with the two patient recruiters with whom he had no significant dealings.  He professes that performing this calculation would result in a loss amount of $10,009,641.

We review the district court's application of the Guidelines *de novo* and its calculation of the loss amount under USSG § 2B1.1 for clear error.  *United States v. Machado*, 333 F.3d 1225, 1227 (11th Cir. 2003).  Under what is now

§ 2B4.1(b)(1), the loss amount attributable to the defendant under § 2B1.1 corresponds to the value of the bribe or the improper benefit, whichever is greater. *See United States v. Huff*, 609 F.3d 1240, 1245-46 (11th Cir. 2010).  Under USSG § 1B1.3, all of the "relevant conduct" associated with the scheme—including conduct by others that Coloma aided and abetted—must be included in the loss amount.  Specifically, Coloma is responsible for the reasonably foreseeable losses caused by his coconspirators in furtherance of the conspiracy.  *Id*. § 1B1.3(a)(1)(B).

Coloma's presentence report stated that he acted as middle-man between Kallen-Zury and the patient recruiters, and that he instructed the recruiters to falsify their invoices to make them look legitimate.  Because Coloma did not object to these statements, we deem them to be admitted facts for sentencing purposes.  *United States v. Aguilar-Ibarra*, 740 F.3d 587, 592 (11th Cir. 2014) (explaining that a defendant is deemed to have admitted to any statements in the presentence report that he has not objected to with specificity and clarity).  Accordingly, even though the district court did not make an individualized finding regarding Coloma's role in the conspiracy, the record supports Coloma's role as Kallen-Zury's coadjutor.  *See United States v. Ismond*, 993 F.2d 1498, 1499 (11th Cir. 1993).  Because Coloma functioned near the top in the conspiratorial hierarchy

and saw the full scope of the scheme, it was not clear error for the district court to ascribe to him the full amount of HP's fraudulent gain from Medicare.

Coloma argues this case is like *United States v. Hunter*, in which we vacated the sentences of three "runners" in a counterfeit-check scheme because the district court failed to make "particularized findings" regarding the scope of each runner's criminal activity. 323 F.3d 1314, 1316 (11th Cir. 2003). The runners in *Hunter* worked under three recruiters, who in turn worked under two men who printed the checks and ran the conspiracy. *Id*. Unlike the *Hunter* defendants, Coloma was no mere minion. He oversaw multiple patient recruiters, and as such, he held a key role in the conspiracy. The district court properly found him liable for HP's improper gain from Medicare.

## 2.

Second, Coloma challenges his vulnerable victim enhancements, which together raised his offense level four points. *See* USSG § 3A1.1(b)(1), (b)(2). He avers that because he was not personally involved in the selection or treatment of patients, there was no proof he knew vulnerable people were being victimized.

The application of the vulnerable victim enhancement is a mixed question of law and fact that we review *de novo*. But whether a victim is vulnerable is a question of fact, to which we give deference to the district court. *United States v. Moran*, 778 F.3d 942, 959 (11th Cir. 2015). A "vulnerable" victim is a victim

"who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *Id*. at 978 (quoting USSG § 3A1.1, cmt. n.2).  The increase applies when a defendant selected his victims to take advantage of the victims' perceived susceptibility to the offense. *Id*.  Here, as in *Moran*, although Medicare was the primary victim of the defendants' fraud scheme, the patients—who were billed for care they did not need or receive—were also victims of the offense.  *Id*. at 978-79.

As explained, Coloma was positioned at the heart of this conspiracy—between the ringleader Kallen-Zury and the patient recruiters who mustered the victims HP would use to bilk Medicare.  He did not object to statements in the presentence report that many of the patients—who often were substance abusers—were not appropriate patients for the type of psychiatric care HP offered.  As with the defendants in *Moran*, it was not necessary for Coloma to directly participate in the patients' treatment in order to victimize them through the mechanizations of the conspiracy.  Because he is liable for the foreseeable actions of his coconspirators, USSG § 1B1.3(a)(1), and because the conspirators targeted people whose "mental condition" made them "susceptible to the criminal conduct," § 3A1.1, cmt. n.2, the district court did not err in applying the enhancement.

Furthermore, Coloma offers no argument that the number of vulnerable victims was less than "a large number," § 3A1.1(b)(2).  The government argued

"there were hundreds, if not thousands of these substance abusers" who went to HP

for treatment that HP failed to deliver.  (Doc 569 at 37).  Coloma proffers no

evidence to the contrary.  Nor does he argue that these victims were not, in fact,

vulnerable.


**AFFIRMED.**