[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-17358
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cr-20757-JEM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KAREN KALLEN-ZURY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(September 28, 2017)

Before ROSENBAUM, JULIE CARNES, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Karen Kallen-Zury appeals from the district court's summary denial of her motion for new trial based on newly discovered evidence.  She argues that the district court erred in failing to hold an evidentiary hearing before denying her motion, and further, that the court's one-page denial order is insufficient to permit meaningful appellate review.  She also contends that the court abused its discretion in denying her motion for new trial, asserting that the newly discovered evidence she presented, if included in a new trial, would likely result in a different result.  After careful review, we affirm the denial of her motion for new trial.

## I.

After a five-week jury trial, Kallen-Zury was convicted on fraud, illegal kickback, and conspiracy charges[1] based on her operation of a Medicare fraud and kickback scheme at Hollywood Pavilion ("HP"), a mental-health facility she co-owned and operated.

"It is illegal for medical facilities that receive Medicare reimbursements to pay recruiters to bring them patients, but that is what HP did."  *United States v. Kallen-Zury*, 629 F. App'x 894, 898 (11th Cir. 2015).  These recruiters would find patients from as far away as Maryland and would pay to have the patients ride

---

[1] More precisely, Kallen-Zury was convicted of one count of conspiracy to commit health-care fraud and wire fraud, in violation of 18 U.S.C. § 1349; four counts of wire fraud, in violation of 18 U.S.C. § 1343; two counts of health-care fraud, in violation of 18 U.S.C. § 1347; one count of conspiracy to defraud the United States and to pay and receive kickbacks in connection with a federal health-care benefit program, in violation of 18 U.S.C. § 371; and four counts of payment of kickbacks in connection with a federal health-care benefit program, in violation of 42 U.S.C. § 1320a-7b(b)(2)(a).

2

buses down to HP in Hollywood, Florida. *Id.* Most of the patients were drug addicts who did not need the psychiatric services offered at HP. *Id.* So the conspirators often falsified the patients' records to reflect serious psychiatric problems or told the patients to claim psychiatric issues upon admission. *Id.*

HP would admit only patients who had enough days on their Medicare plans to have their treatment periods paid for by the government. *Id.* When the Medicare money ran out, the patients would be dismissed. *Id.* Through this scheme, HP filed tens of millions of dollars in fraudulent claims to Medicare. *Id.*

HP's patient recruiters included Keith Humes, Jean Luc Veraguas, Mathis Moore, and Gloria Himmons. At trial, the recruiters explained that HP had them enter into contracts that stated they were providing either "case management" or "marketing" services. HP also asked the recruiters to submit reports documenting their purported performance of these services. The recruiters' reports, however, were false. The recruiters were never asked to and never did provide these other services. Instead, they were paid solely to refer patients.

Testifying in her own defense at trial, Kallen-Zury asserted that she acted in good faith and believed the recruiters were providing lawful case-management or marketing services. She asserted that HP's lawyers drafted the contracts with the recruiters and instructed HP's management how to ensure that the agreements with the recruiters fell within statutory and regulatory "safe harbor" provisions.

3

The jury found Kallen-Zury guilty of all the charges against her. The district court sentenced her to a total of 300 months of imprisonment.

After trial, Kallen-Zury discovered that the "lead investigator inaccurately testified that a key document—a digital scan of a handwritten patient register—was found on Kallen-Zury's office computer." 629 F. App'x at 898. The patient register memorialized patient information, including which recruiter referred each patient to HP. *Id.* The patient register was important because it had not been produced by HP in response to an administrative subpoena. *Id.* It also showed "HP's methodology for tracking referrals." *Id.* "Beginning in July 2005, when Kallen-Zury became head of HP after the death of her father, the register included a column that documented which recruiter referred each patient to HP." *Id.* Because Kallen-Zury in her testimony denied maintaining or possessing the register, the government used this contradiction to attack her credibility. *Id.*

It turns out, however, that the disk containing the digital scan had been mislabeled and that the register was actually found on the computer of another HP employee. On the basis of that mistake, Kallen-Zury filed a motion for a new trial, which the district court denied.

On appeal from both the criminal judgment and the denial of her motion for new trial, we concluded that the inaccurate testimony concerning the location of the patient register "was not reasonably likely to affect the jury's judgment." *Id.* at

4

899. We said so for two reasons. "First, in the context of this massive five-week trial, the disagreement over the location of the patient register was picayune," since Kallen-Zury's own testimony showed that she "clearly knew the location of the physical register and had the authority to control its content." *Id.* "Second, any harm to Kallen–Zury's credibility over the location of the patient register was cumulative," since "Kallen–Zury's testimony contradicted the testimony of several government witnesses on a number of points." *Id.* at 899–900.

In June 2016, several months after we affirmed her convictions, Kallen-Zury filed a motion for a new trial under Federal Rule of Criminal Procedure 33(b)(1) based on newly discovered evidence, asserting four grounds and requesting an evidentiary hearing. First, she claimed that the testimony of former HP employee Melvin Hunter at his 2015 trial showed that the government's evidence about the patient register was substantially inaccurate. Second, she argued that Hunter's potential testimony directly contradicted the account of Himmons, one of the patient recruiters who cooperated with the government. Third, she contended that new evidence suggested that the government had accessed her privileged attorney-client communications before trial. And finally, she maintained that the government had intruded on the defense camp's work product by making copies of all materials that the defense requested from a custodian of seized records.

5

The government responded that Kallen-Zury's proffered evidence was not new or material and that there was no likelihood that the evidence would change the result of the trial. Without holding an evidentiary hearing, the district court denied the motion for new trial in a one-page summary order. Kallen-Zury now appeals.

## II.

We review the denial of a motion for new trial based on newly discovered evidence for an abuse of discretion. *United States v. Vallejo*, 297 F.3d 1154, 1163 (11th Cir. 2002). We also review for an abuse of discretion a district court's decision not to hold an evidentiary hearing or compel discovery. *United States v. Stein*, 846 F.3d 1135, 1151 (11th Cir. 2017); *United States v. Slocum*, 708 F.2d 587, 600 (11th Cir. 1983). Abuse-of-discretion review is deferential: we will affirm unless the district court made a clear error of judgment or applied the wrong legal standard. *United States v. Lyons*, 403 F.3d 1248, 1255 (11th Cir. 2005).

## III.

Initially, we address Kallen-Zury's contention that the district court's summary denial of her motion for new trial is insufficient to permit meaningful appellate review. We have long held that courts are required to develop adequate factual records and sufficiently clear findings as to key issues in order to facilitate meaningful appellate review. *United States v. Gupta*, 572 F.3d 878, 889 (11th Cir.

6

2009). Nevertheless, while explicit fact determinations are preferred, particularly where, as here, the record is extensive and the court is much more familiar with the underlying issues, a court's failure to make such determinations does not require remand if meaningful appellate review is possible. *See United States v. Cruz*, 946 F.2d 122, 124 n.1 (11th Cir. 1991) (sentencing context); *United States v. Villarino*, 930 F.2d 1527, 1528-29 (11th Cir. 1991) (sentencing context).

Where a district court's order is summary in nature, we may "undertake our own plenary inquiry into the" issue on appeal if the record is complete and "provides an adequate basis" for our review. *Hall v. Holder*, 117 F.3d 1222, 1226 (11th Cir. 1997). Where, however, the record "wholly fail[s] to provide [us] with an opportunity to conduct meaningful appellate review," we will vacate a district court's order and remand to the district court to consider the case in full and enter a reasoned order. *Danley v. Allen*, 480 F.3d 1090, 1091–92 (11th Cir. 2007); *see also Clay v. Equifax, Inc.*, 762 F.2d 952, 957–58 (11th Cir. 1985) (collecting cases in which the Supreme Court and our predecessor Court "urged the district court to state the reason for its decision and the underlying predicate").

Here, we find that the record is complete enough to provide an adequate basis for our review. Although the district court made no specific fact findings in its order denying Rule 33(b) relief, meaningful review is possible in light of the extensive trial record, our own affirmance of Kallen-Zury's conviction on direct

7

appeal, and the parties' agreement on certain undisputed facts. *See United States v. Robertson*, 493 F.3d 1322, 1334 (11th Cir. 2007) (when reasonable to do so, appellate courts may infer implied factual findings consistent with the judgment under review). Any unresolved factual disputes, such as whether Hunter's testimony constitutes "newly discovered" evidence, do not affect our determination that the district court properly denied the motion for new trial.

For similar reasons, we conclude that the district court did not abuse its discretion by refusing to hold an evidentiary hearing on Kallen-Zury's Rule 33(b) motion. An evidentiary hearing is not required if the record contains all of the evidence needed to dispose of each of the grounds asserted as the basis for a new trial. *United States v. Scrushy*, 721 F.3d 1288, 1305 n.30 (11th Cir. 2013). And there is no need for post-trial discovery or an evidentiary hearing based upon mere speculation that it could produce helpful information. *United States v. Arias-Izquierdo*, 449 F.3d 1168, 1189 (11th Cir. 2006); *United States v. Champion*, 813 F.2d 1154, 1171 n.25 (11th Cir. 1987). As we explain in more detail below, no evidentiary hearing was required either because the record contains all of the evidence needed to dispose of Kallen-Zury's claims or because her claims are too speculative.

8

## IV.

Kallen-Zury moved for a new trial based on newly discovered evidence under Rule 33(b), Fed. R. Crim. P. "Motions for a new trial based on newly discovered evidence are highly disfavored in the Eleventh Circuit and should be granted only with great caution. Indeed, the defendant bears the burden of justifying a new trial." *United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006) (*en banc*) (quotation marks omitted).

To succeed on a motion for new trial based on newly discovered evidence, a movant must prove that (1) the evidence was discovered after trial; (2) the failure to discover the evidence was not due to a lack of due diligence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to issues before the court; and (5) the evidence is of such a nature that a new trial would probably produce a different result. *United States v. Barsoum*, 763 F.3d 1321, 1341 (11th Cir. 2014). The failure to satisfy any of the five requirements is fatal to a motion for new trial. *United States v. Taohim*, 817 F.3d 1215, 1223 (11th Cir. 2013).

Kallen-Zury asserts that she has newly discovered evidence relating to the following issues: (1) the patient register; (2) Himmons's trial testimony; (3) the government's alleged invasion of her attorney-client privilege; and (4) the government's alleged intrusion on the work product of the defense team. We address each claim in turn.

9

### A.     *The Patient Register*

As noted above, the patient register was used to track information about patients, including referral sources. In July 2005, someone changed the name of one of the register's columns from "Room or Ward" to "Ref. source." Thereafter, HP employees began entering patients' referral sources in that column. At trial, the government used the patient register and its location to suggest that Kallen-Zury had the patient register on her computer, that she failed to disclose it in response to a subpoena, that she redesigned the register after her father's death in order to track referrals, and that she falsely testified about these facts at trial.

In Kallen-Zury's view, Hunter's potential testimony completely contradicts the government's evidence about the patient register. Hunter was the inpatient admissions supervisor at HP during the events at issue. He testified at his 2015 trial, roughly two years after Kallen-Zury's, that he was the one who designed the column that identified the referral source, that the "scanned version" of the register was on his computer, that referral information had been recorded for all patients before 2005, and that tracking referral sources was a customary practice in medical facilities.

Kallen-Zury's current argument is an extension of one we addressed, and rejected, when resolving her direct appeal. In that decision, we concluded that the lead agent's inaccurate testimony concerning the location of the patient register

10

and who oversaw it on a regular basis, "was not reasonably likely to affect the jury's judgment." *Kallen-Zury*, 629 F. App'x at 899. In reaching that conclusion, we found that Kallen-Zury's own testimony showed that she "clearly knew the location of the physical register and had the authority to control its content." *Id.* Nothing in Hunter's potential testimony contradicts that statement.

Nor is there any reason to believe that the additional facts regarding the patient register, which was a minor point "in the context of this massive five-week trial," would have made a difference in the trial outcome. *See id.* Indeed, Kallen-Zury herself admitted she tracked referrals on a regular basis because "[r]eferrals were [her] business." So even if the jury heard that Hunter changed the column on the patient register for reasons independent of Kallen-Zury, that would not cast doubt on evidence showing that Kallen-Zury knew the location of the register and regularly tracked referral sources. Because the patient-register evidence, even if it newly discovered, is not such that a new trial would probably produce a different result, the district court properly denied this claim without an evidentiary hearing.[2] *See Barsoum*, 763 F.3d at 1341; *Scrushy*, 721 F.3d at 1305 n.30.

---

[2] The statement of facts in Kallen-Zury's initial brief to this Court contains several assertions that the government engaged in wrongdoing at trial by relying on false testimony about the patient register and the defense's response to a government subpoena. Those assertions appear to be at least partially inconsistent with Kallen-Zury's prior position to this Court. *See Kallen-Zury*, 629 Fed. App'x at 899 ("At oral argument, Kallen-Zury's attorney conceded that the case agent's testimony was not a true *Giglio* error because neither the case agent nor the prosecutors knew the information was false."). Regardless, she does not raise these points in the argument section of her initial brief. Accordingly, we conclude that her passing

### B.    Gloria Himmons

Himmons, who was a patient recruiter for HP, testified that Hunter knew of the fraudulent scheme and told Himmons to submit false reports showing that she was performing marketing services.  According to Himmons, Hunter told her "to just put a couple hospitals or something like that on there to show . . . you getting places that refer you more patients."  He explained that Kallen-Zury would be happy to see that "new places" were sending patients to HP, thereby indirectly suggesting that Kallen-Zury knew that the reports were false.  Himmons never spoke directly with Kallen-Zury about her reports, however, and she did not know whether Kallen-Zury knew that the reports were inaccurate.  Himmons also said that Hunter referred to patients with full Medicare eligibility as "virgins."

At his own trial, however, Hunter denied that either he or Kallen-Zury knew that Himmons had falsified information in her reports or that she was not actually performing marketing services for HP.  He also denied using the term "virgin" or making statements about Kallen-Zury to Himmons.

Kallen-Zury claims that Hunter's new testimony warrants a new trial because it contradicts Himmons's testimony, which she says was a key component

---

references to these matters are insufficient to preserve the issue for appeal.  *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("A party fails to adequately brief a claim when he does not plainly and prominently raise it, for instance by devoting a discrete section of his argument to those claims.") (internal quotation marks omitted).  Her arguments in her reply brief come too late.  *See id.* at 683.

of the government's case that "linked Karen Kallen-Zury to the efforts to disguise recruiters as employees and consultants." She asserts that Himmons's testimony was critical because Himmons was the only patient recruiter whose testimony was unimpeached during trial.

However, Hunter's potential testimony is not of such a nature that a new trial would probably produce a different result. *Barsoum*, 763 F.3d at 1341. As we said in resolving Kallen-Zury's direct appeal, "the government's evidence establishing the fraud conspiracy was strong." *Kallen-Zury*, 629 F. App'x at 906. The "backbone" of the government's case was the testimony of several patient recruiters who cooperated with the government, including Humes, Veraguas, Moore, and Himmons. *Id.* at 897. Although Hunter's testimony undermines Himmons's testimony to some extent, the backbone remains strong even with Hunter's testimony.

For starters, Himmons's testimony was largely cumulative of the testimony from the other patient recruiters. The patient recruiters all gave similar explanations of their work for HP. They were paid kickbacks for referring patients. To disguise their actual roles, they were asked to sign case-management or marketing contracts with HP, and they submitted false reports documenting the performance of these services. Despite the contracts, they were not asked to do

13

anything besides recruit patients. And they were paid with checks signed, in the main, by Kallen-Zury.

More significantly, the other patient recruiters, particularly Humes and Moore, implicated Kallen-Zury in the fraudulent scheme much more directly than did Himmons. Whereas Himmons had little interaction with Kallen-Zury, both Humes and Moore testified about in-person meetings with Kallen-Zury in which patient referrals and kickbacks were discussed.

Humes, who earned over $400,000 from patient recruiting for HP from 2005 to 2008, testified that HP started out paying him $300 for each Medicare inpatient referral and $100 for each Medicare outpatient referral. At some point, he complained to Kallen-Zury that his profits for referring patients were down because he was paying for both a sub-recruiter (Himmons) and bus tickets for the patients to travel to South Florida. Kallen-Zury responded that Humes's "numbers" were good and that she would see what she could do. Thereafter, Kallen-Zury offered Humes a flat fee of $15,000 per month and told him that HP would be moving him to a marketing contract to justify the higher payments. Humes was a convicted felon with no marketing experience.

Humes also testified that he met with Kallen-Zury in her office about once a month to talk about how many patients he was bringing to HP. She told him that patients needed to stay in the hospital for 21 days so that HP could make more

14

money.  She also told him to explain to his patients that they should claim to be depressed or suicidal upon admission to HP.

For his part, Moore testified that he started recruiting patients for HP after meeting with Kallen-Zury and two others.  At the first meeting, Kallen-Zury said she wanted to talk to him about "getting clients," and they discussed potential payment amounts for patient referrals.  The following week, Kallen-Zury stated that they needed to figure out how to pay Moore for patient referrals in a way that looked "legal."  Moore offered that he owned a non-profit company.  They agreed that HP would pay Moore $2,500 per month for five to ten inpatient referrals.  Several months later, he again met with Kallen-Zury and entered into a similar arrangement for outpatient referrals:  $2,500 per month for about 10 patients.

The government also produced evidence to corroborate the patient recruiters' accounts.  For instance, two months after agreeing to pay Moore $2,500 for the outpatient referrals, Kallen-Zury wrote to one of her lawyers that she had decided not to give Moore a contract because "[h]is numbers" for the past month did not merit one.  She also stated, "I just heard that he had 8 patients over at one of my competitors, where he's trying to get a contract.  He's too stupid to understand that you can't do that.  Our market is too small for me to not find out."  Kallen-Zury noted that she planned to "stick[] with the outpatient only for $2500 per month," and her lawyer advised her to enter into a contract with Moore.

15

Thereafter, Kallen-Zury and Moore signed a marketing agreement stating that Moore would provide certain marketing services to HP in exchange for $2,500 per month. But Moore, like the other recruiters, did not actually provide those marketing services.

Plus, an accounts-payable specialist for HP testified that the first time she received invoices from Humes and Veraguas, she asked Kallen-Zury how to categorize them. On both occasions, Kallen-Zury responded, "Patient referrals." In addition, Humes's invoices from January 2007 through December 2007 were for $15,000 in services, which was the monthly fee reflected in his testimony for referring patients for Kallen-Zury.

In light of this strong evidence of guilt, Hunter's potential testimony does not, as Kallen-Zury asserts, "cast[] the evidence at trial in an entirely different light." Hunter contradicted Himmons on certain points, but Himmons did not have any direct interaction with Kallen-Zury, and her testimony was largely cumulative. Moreover, the jury heard Kallen-Zury's explanation of her conduct, and "[her] testimony, if disbelieved by the jury, may also be considered substantive evidence of [her] guilt." *See Taohim*, 817 F.3d at 1223. Hunter's potential impact on Kallen-Zury's credibility was not likely to be substantial given that "Kallen-Zury's testimony contradicted the testimony of several government witnesses on a number

16

of points." *See Kallen-Zury*, 629 F. App'x at 899–900.  Accordingly, the district court properly denied this claim without an evidentiary hearing.

In sum, the district court properly denied Kallen-Zury's motion for new trial based on new evidence from Hunter because his testimony about the patient register and about Himmons, whether considered individually or cumulatively, was not of such a nature that a new trial would probably produce a different result.

### C.    Attorney-Client Privilege

Before trial, the government obtained a search warrant for an AOL email account Kallen-Zury used to conduct business at HP.  AOL produced Kallen-Zury's emails in response to the warrant.  In a letter to Kallen-Zury's attorneys on May 7, 2013, the government explained that the emails had been sent to a "filter team" for review.  The filter team, according to the letter, released to the investigation team 843 emails as non-privileged and potentially relevant.  In addition, the filter team released four other emails to the investigation team on May 6 once the district court ruled that they were admissible under the crime/fraud exception after an in camera hearing.  The government further asserted that the investigation team had not reviewed and would not review any additional materials obtained from AOL for purposes of the trial.  Finally, the government noted that Kallen-Zury could request any and all materials within the possession, custody, or control of either the filter team or the investigation team.

17

More than a year after Kallen-Zury's trial, the government produced privileged material from her AOL account during discovery in the case against Hunter.   The prosecutor in that case was also involved in Kallen-Zury's prosecution.   Kallen-Zury claims that the government's disclosure of privileged information after her trial requires an evidentiary hearing to determine whether the government accessed the information before trial.  We disagree.

The district court did not abuse its discretion in refusing to grant discovery, an evidentiary hearing, or a new trial related to this claim.  First, Kallen-Zury's briefing to this Court makes no argument as to how the disclosure of privileged communications to defense attorneys in a separate case satisfies the requirements of a Rule 33(b)(1) motion for new trial.  While "[n]ewly discovered evidence need not relate directly to the issue of guilt or innocence to justify a new trial, but may be probative of another issue of law," the new evidence still must be such that it "would afford reasonable grounds to question . . . the integrity of the verdict." *Scrushy*, 721 at 1304 (internal quotation marks omitted).  Kallen-Zury does not explain how a hearing or discovery on the privilege issue would result in material evidence that could have changed the outcome of her case.

Second, while Kallen-Zury's allegations suggest that the government improperly accessed or disclosed her privileged communications *after* trial, her contention that the government invaded her attorney-client privilege *before* trial is

18

wholly speculative.  And there is no need for post-trial discovery or an evidentiary hearing based upon mere speculation that it could produce helpful information. *See Arias-Izquierdo*, 449 F.3d at 1189; *Champion*, 813 F.2d at 1171 n.25.

Kallen-Zury points to nothing in the extensive record of her case to suggest that, contrary to the government's representations to her in May 2013, a member of the prosecution viewed her privileged communications while her criminal proceedings were ongoing.  The disclosure of these materials occurred long after her trial was over.  Indeed, the first indictment in that separate case issued almost a year after the verdict in Kallen-Zury's case.  Without some evidence to support her allegations of governmental wrongdoing, the court properly denied her requests for discovery and an evidentiary hearing.[3]  *See Champion*, 813 F.2d at 1171 n.25 ("Absent some evidence suggesting wrongdoing, the trial court was not obligated to grant a hearing to enable appellant to conduct a fishing expedition as to why the government chose to present its case in the manner in which it did.").

Accordingly, the district court did not abuse its discretion in denying Kallen-Zury's request for an evidentiary hearing and discovery on the alleged breach of her attorney-client privilege.

---

[3] We do not mean to minimize Kallen-Zury's allegations, but there is nothing to suggest wrongdoing in a way that affected the outcome of her trial.

19

### D    *Intrusion on the Defense Camp's Work Product*

After the government executed a search warrant at HP, it stored the seized materials in an FBI warehouse.  In December 2012, members of Kallen-Zury's trial team visited that facility to review the seized materials and identify items they wanted scanned.  The government told Kallen-Zury's counsel that a government-approved vendor needed to scan the defense-selected materials off-site and that the government required a copy of all materials that the vendor scanned.  In January 2013, the vendor completed the scanning project and created two CDs—one for Kallen-Zury's counsel and one for the government—containing the materials Kallen-Zury's team had selected.

Kallen-Zury admits that the "defense was aware that certain documents that the defense had requested to be copied from the seized material were also duplicated for the government."  But she now claims that an evidentiary hearing is necessary to determine whether any members of the prosecution team "reviewed the duplicate disk and thereby invaded the work product of the defense team."  Again, we disagree.

The district court properly denied Kallen-Zury's request for a new trial, discovery, or an evidentiary hearing on this claim.  The record conclusively establishes that Kallen-Zury's attorneys were aware before her trial that the government had received a copy of the materials she requested.  Because Kallen-

20

Zury knew about this practice before trial, it is not "newly discovered" evidence that could support a new trial motion under Rule 33(b)(1). *See Barsoum*, 763 F.3d at 1341. Accordingly, the court did not abuse its discretion in rejecting this claim without discovery or an evidentiary hearing.

## V.

In sum, the district court did not abuse its discretion in denying Kallen-Zury's Rule 33(b)(1) motion for a new trial based on newly discovered evidence.

**AFFIRMED.**