[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-12385

_____

KAREN KALLEN-ZURY,

　　　　　　　　　　　　　　　　　　　　Petitioner-Appellant,

*versus*

UNITED STATES OF AMERICA,

　　　　　　　　　　　　　　　　　　　　Respondent-Appellee.

_____

Appeal from the United States District Court

for the Southern District of Florida

D.C. Docket Nos. 1:17-cv-21269-JEM and 1:12-cr-20757-JEM-1

_____

Before JORDAN, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

After a five-week trial, a jury found Karen Kallen-Zury guilty on various counts relating to Medicare fraud. During the trial, the jury heard from many witnesses and was presented with many documents corroborating the government's theory of the case and discrediting Kallen-Zury's testimony. Following the district court's denial of her 28 U.S.C. § 2255 motion to vacate her conviction, Kallen-Zury appeals the denial and argues that her trial counsel should have called several witnesses in her defense, that counsel's failure to do so constituted ineffective assistance of counsel, and that we should vacate her conviction and grant her a new trial.

With the benefit of oral argument, and for the reasons explained below, we find that trial counsel's decision not to call these witnesses did not prejudice her. Accordingly, we affirm.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Underlying Criminal Case

This is the fourth time Kallen-Zury has come before this Court regarding her trial. We outlined the facts of this case in our decisions denying Kallen-Zury's prior appeals. *United States v. Kallen-Zury* (*Kallen-Zury I*), 629 F. App'x 894 (11th Cir. 2015); *United States v. Kallen-Zury* (*Kallen-Zury II*), 710 F. App'x 365

(11th Cir. 2017); *see also United States v. Kallen-Zury (Kallen-Zury III)*, 736 F. App'x 848 (11th Cir. 2018).[1]

"Kallen-Zury co-owned and operated Hollywood Pavilion ('HP')—a mental health facility that included both inpatient and outpatient treatment programs"—as well as "a nursing home and rehabilitation center named Hollywood Hills ('HH') on the same premises." *Kallen-Zury I*, 629 F. App'x at 897. During her tenure at HP, the facility, which received Medicare reimbursements, paid recruiters to bring patients to HP. *Id.* This is illegal. *Id.* "The backbone of the government's case was the testimony of several patient recruiters"—"Keith Humes, Jean Luc Veraguas, Mathis Moore, Curtis Gates, and Gloria Himmons, who worked as a sub-recruiter under Humes"—"who pleaded guilty to Medicare fraud related to HP and other facilities." *Id.*

"These recruiters would find patients from as far away as Maryland and would pay to have the patients ride buses down to HP in Hollywood, Florida." *Kallen-Zury II*, 710 F. App'x at 367. "Most of the[se] patients were drug addicts who did not need the psychiatric services offered at HP." *Id.* Accordingly, "the conspirators often falsified the patients' records to reflect serious psychiatric problems or told the patients to [say they had] psychiatric issues

---

[1] Kallen-Zury has acknowledged that "the actual testimony that was presented at the initial trial in 2013 has been fairly presented in the prior opinions of this Court," although she disputes the testimony's truthfulness.

upon admission" to HP.  *Id.*  HP would then pay the recruiter for each patient the recruiter sent to its facility.  *See id.* at 367–68.

"Additionally, HP . . . only admit[ted] patients who had enough days on their Medicare plans to have their treatment periods paid for by the government."  *Kallen-Zury I*, 629 F. App'x at 897.  When the Medicare money ran out for a patient, the facility would stop treatment and dismiss the patient.  *Id.*  "Through this scheme, HP filed tens of millions of dollars in fraudulent claims to Medicare."  *Id.*  "Some . . . recruiters also ran halfway houses and made extra money when HP referred discharged patients to those facilities."  *Id.*

"At trial, the recruiters explained that HP had them enter into contracts that stated they were providing either 'case management' or 'marketing' services."  *Kallen-Zury II*, 710 F. App'x at 367–68.  "HP also asked the recruiters to submit reports documenting their purported performance of these services."  *Id.* at 368.  "The recruiters' reports, however, were false," as the recruiters "were never asked to and never did provide these other services."  *Id.*  "Instead, they were paid solely to refer patients."  *Id.*

Several recruiters, each of whom testified under a grant of immunity, claimed to have discussed with Kallen-Zury how HP would pay them to recruit patients.  Some recruiters also claimed that they discussed their recruiting efforts with other HP employees.  And Himmons testified that she discussed recruiting patients for HP with Kallen-Zury herself.

The government also produced various documents at trial, including a "patient register" that tracked which patients were referred by which recruiters.[2]  The government additionally presented the testimony of Dr. Gumer to explain that most of the patients admitted to HP did not need psychiatric treatment, either because they only had substance abuse issues or because they were homeless.

The defendants, including Kallen-Zury, argued "that they acted in good faith and believed the recruiters were providing lawful 'marketing' services." *Kallen-Zury I*, 629 F. App'x at 897. "They argued that HP's lawyers drafted the contracts with the recruiters and instructed HP's management [on] how to ensure that their agreements with the recruiters fell within statutory and regulatory 'safe harbor' provisions." *Id.* at 897–98.

---

[2] At trial, an agent testified that the patient register was found on Kallen-Zury's office computer, which Kallen-Zury denied maintaining and having a copy of, prompting the government in closing to use this contradiction to attack her credibility.  "The prosecutor sarcastically called her 'unlucky' for having such an important document on her computer without even knowing it." *Kallen-Zury I*, 629 F. App'x at 898.  "After [the] trial, the government realized that the disc containing the register had been mislabeled by someone from the Department of Health and Human Services." *Id.*  "Although the prosecutors and the lead investigator did not know it, agents had found the document on the computer of another HP employee." *Id.*  This discovery prompted Kallen-Zury to move for a new trial, which the district court denied. *Id.*  We affirmed, finding that there was no harmful error in this testimony, given the weight of evidence against her. *Id.* at 899–900, 915.  This issue has therefore been resolved and is not part of the current appeal.

After the government rested, trial counsel for Kallen-Zury, Michael Pasano—who had implied in his opening statement that he would call several witnesses—ended up only calling Kallen-Zury as a fact witness.[3] Pasano told the jury that they would hear testimony discussing admission practices for people with mental health issues along with substance abuse issues, and testimony discussing the operation of HP. Ultimately, Pasano made the decision to put Kallen-Zury on the stand first to try to catch the government off guard at the end of its four-week case. The theory was that the government was so focused on its own witnesses, that it may have been unprepared to cross-examine Kallen-Zury. Pasano hoped to get her off the stand in one day without the government impugning her credibility too much, as her credibility was the key to Pasano's theory of the case: that Kallen-Zury attempted to comply with all laws in good faith. Pasano discussed this strategy with Kallen-Zury during trial.

On the stand, Kallen-Zury testified that she thought these recruiters constituted legitimate marketing services for the hospital, a belief which she claimed HP's attorneys verified. After Kallen-Zury finished testifying, Pasano introduced some documents and a summary witness that he believed would not undermine Kallen-Zury's testimony.

---

[3] Pasano also called two character witnesses and one summary witness who summarized HP's financial transactions.

20-12385                Opinion of the Court                7

At a later 28 U.S.C. § 2255 hearing, Pasano stated that he made the "tactical choice" not to call the witnesses at issue in this appeal after Kallen-Zury testified in her own defense. Pasano did so because he did not think the remaining witnesses would significantly move the needle in the jury's minds, and because calling those witnesses would provide an opportunity for the government to undermine Kallen-Zury's testimony. As the trial progressed and the district court ruled on various issues, Kallen-Zury focused on asserting a "good faith" defense, a strategy which Pasano and Kallen-Zury discussed. In light of this defense, the credibility of Kallen-Zury was paramount. *Kallen-Zury I*, 629 F. App'x at 898. Because the credibility of Kallen-Zury was, in Pasano's mind, critical to victory at trial, he determined to focus on this good-faith defense and not put other fact witnesses on the stand that could undermine her credibility or muddy the waters.

This strategy ultimately failed. The jury found Kallen-Zury and others guilty of all the charges against them, which for Kallen-Zury included: (1) conspiracy to commit health care fraud and wire fraud, 18 U.S.C. § 1349; (2) wire fraud, 18 U.S.C. § 1343; (3) health care fraud, 18 U.S.C. § 1347; (4) conspiracy to defraud the United States and to pay and receive kickbacks in connection with a federal health-care benefit program, 18 U.S.C. § 371; and (5) payment of kickbacks in connection with a federal health-care benefit program, 42 U.S.C. § 1320a–7b(b)(2)(A). *Kallen-Zury I*, 629 F. App'x at 898. The judge sentenced Kallen-Zury to twenty-five years in prison.

## B.    Previous Appeals

Kallen-Zury has come before this Court three times before this present appeal regarding her trial. After her conviction, Kallen-Zury filed a direct appeal. We affirmed her conviction and the district court's denial of her motion for a new trial. *See Kallen-Zury I*, 629 F. App'x at 897, 899–900. We denied her motion for reconsideration and for en banc review. Then, in 2016 and 2017, Kallen-Zury filed motions under Federal Rule of Criminal Procedure 33(b)(1) for a new trial based on newly discovered evidence. The district court denied both motions, and we affirmed those decisions on appeal. *Kallen-Zury II*, 710 F. App'x at 371–73; *Kallen-Zury III*, 736 F. App'x at 852 . We concluded that the new evidence Kallen-Zury highlighted did not warrant a new trial because it was largely cumulative or impeaching, and because it did not undermine confidence in the integrity of the verdict. *See Kallen-Zury II*, 710 F. App'x at 372–73; *Kallen-Zury III*, 736 F. App'x at 851.

## C.    Motion to Vacate

When those attempts failed, Kallen-Zury filed the § 2255 motion to vacate at issue in this appeal, in which she detailed the prejudice she suffered at trial as a result of her trial counsel not calling various witnesses or presenting certain documents. In her § 2255 motion to vacate, Kallen-Zury argued that she should have a new trial because Pasano did not call Vala Wagie, Rocky Davidson, Angela Rosier, Aaron Danzig, Melvin Hunter, and Dr. Jeffrey Danziger as witnesses, and did not present various documents, including invoices from the law firm Baker Hostetler, which advised HP and Kallen-Zury during this time. Kallen-Zury described

in her motion the testimony each of these witnesses—who testified at the evidentiary hearing on the § 2255 motion—would have provided had Pasano called them to the stand. We set forth the descriptions of testimony as follows.

Vala Wagie, a risk management professional, would have provided character testimony, and her opinion that HP was run well. She would also testify that Kallen-Zury never asked her to hide or alter any documents, that Kallen-Zury was not in charge of clinical decisions at HP, and that all patients needed the treatment they received.

Rocky Davidson, a certified public accountant who did outsourced accounting for HP, would have testified that HP was not profitable enough to pay Kallen-Zury tens of millions of dollars and that a large portion of her income came from an unrelated nursing home not subject to this investigation.

Angela Rosier would have testified that she oversaw patient charts and records, that she was unaware of any falsifications or alterations of those charts, that she was unaware of any mistreatment or unnecessary treatment of patients, and that Kallen-Zury had nothing to do with patient care or treatment. Rosier was also involved in gathering records to comply with the subpoena and would testify that she was unaware of any effort to obstruct justice.

Aaron Danzig, an attorney, would have testified about his work complying with the government's document requests to HP. He instructed Kallen-Zury on how to respond to those requests,

sent her newspaper articles and indictments as to other fraud investigations as part of that advice, which the government later claimed was evidence of fraudulent intent, and he was working on having the original patient register scanned and sent to the government when the register was seized pursuant to a search warrant.

Melvin Hunter, who oversaw the Admissions Department at HP and was tried separately, would have testified that patients who arrived at the facility were usually "pre-cleared" through an interview process—explaining the high admission rate the government claimed proved fraud—but that doctors at HP ultimately made the final admission decision. Hunter also would have testified that he never told Himmons to lie nor told Himmons that Kallen-Zury was not satisfied with the number of patients Himmons was referring to HP. Additionally, Hunter would have stated that Kallen-Zury did not have a role in altering the patient register, as it was his job, that he altered the columns in the patient register, and that the government seized those hard copy binders of patient registers during their search of the premises. Hunter also claimed he would have waived his Fifth Amendment rights if he testified at Kallen-Zury's trial.

Dr. Jeffrey Danziger, the defense's medical expert, would have testified that each of the nineteen patients he reviewed were properly admitted, and that the patient charts were internally consistent, meaning doctoring them would have required dozens of people to be in on the fraud. He would also have explained the relationship between substance abuse and mental health issues,

which was important because many patients at HP suffered from both and because the government cited to patients with substance abuse as proof of HP admitting patients that did not suffer from mental health issues.

The district court referred Kallen-Zury's motion to vacate to a magistrate judge. After three days of evidentiary hearings and a thorough review of the record, the magistrate judge recommended the motion to vacate be denied. The magistrate judge addressed each potential witness, summarized their testimony at the evidentiary hearings, and then made the following credibility and bias assessments.

The magistrate judge found that Wagie was credible within the areas where she had knowledge during her employment at HP. But Wagie admitted she had no knowledge regarding HP's marketing or recruiting operations. Additionally, the magistrate judge noted that Wagie had a "bias trend . . . in favor of Kallen-Zury."

The magistrate judge found Davidson's testimony to be knowledgeable and credible. But given that he admitted all the payments shown on the government's trial chart came from HP's account, and not the nursing home's account, his trial testimony that Kallen-Zury's money came from sources other than HP would have had minimal value.

Rosier was evasive and not credible, according to the magistrate judge, particularly where she discussed signed blank treatment plan sheets in patient charts. After acknowledging that it was

wrong to have signed blank patient sheets, she provided excuses and conflicting explanations about why examples of those signed blank sheets existed at HP, when confronted with multiple such instances during cross-examination.

Danzig was generally credible but tainted by self-interest in justifying his handling of the government subpoenas, according to the magistrate judge. Therefore, the magistrate judge found that his testimony would have little value.

Hunter was biased and inconsistent. According to the magistrate judge, he wanted to retaliate against the government given his prosecution in a parallel case. The magistrate judge also found Hunter's assertion that he would have waived his Fifth Amendment rights and testified at Kallen-Zury's trial was contradicted by the fact that he invoked those same rights when he was subpoenaed by the grand jury in Kallen-Zury's case. Additionally, when Kallen-Zury's trial counsel asked Hunter to testify, his attorney stated Hunter would assert his Fifth Amendment rights if called to the stand.

Dr. Danziger was credible, but his testimony was of limited value according to the judge. His review was only based on a few patients (nineteen out of thousands), and his opinions were predicated on the assumption that all the chart entries were true and accurate, even though he had no corroboration to support that assumption.

The magistrate judge also considered Pasano's explanation for his actions and found him to be credible and reliable. She concluded Pasano provided reasonable explanations as to why he made the decisions he did at trial, based on the dynamics of the trial and the factors present at that time.

After reviewing the witnesses' testimony from the evidentiary hearing and making credibility determinations, the magistrate judge found that Kallen-Zury had not satisfied either prong of the test for ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 687 (1984). As to the first prong, i.e., deficient performance, none of Pasano's decisions on the presentation of witnesses and documents were of the kind that no competent counsel would have taken. This was especially true given the strong presumption that his actions fell within the wide range of reasonable conduct given his "ample prior trial experience." Moving to the second prong—prejudice—the magistrate judge found that there was no reasonable probability that Kallen-Zury's trial would have had a different outcome had Pasano introduced those witnesses or documents, and therefore Kallen-Zury could not show prejudice. The magistrate judge reviewed his or her credibility determinations to conclude that the witnesses were either credible, but without valuable testimony, or not credible and inconsistent. Because Kallen-Zury could not satisfy either prong of *Strickland*, the magistrate judge recommended denying the motion to vacate.

On April 30, 2020, the district court, after reviewing the record, adopted the magistrate judge's report and recommendation. The district court then issued a certificate of appealability "as to [Kallen-Zury's] claim that her former trial counsel was ineffective for failing to call any witnesses at trial other than [Kallen-Zury] herself."

Now, in her fourth appeal to this Court regarding her trial, Kallen-Zury contends that the district court erred in denying her motion to vacate under § 2255.

## II.    STANDARD OF REVIEW

In a § 2255 proceeding, we review the district court's legal conclusions *de novo* and the underlying factual findings for clear error. *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (citation omitted). "We allot 'substantial deference to the factfinder . . . in reaching credibility determinations with respect to witness testimony.'" *Devine v. United States*, 520 F.3d 1286, 1287 (11th Cir. 2008) (quoting *United States v. McPhee*, 336 F.3d 1269, 1275 (11th Cir. 2003)).

## III.    ANALYSIS

### A.    Scope of Appeal

Before getting to the merits of the case, there are two related procedural issues we must address. On appeal, Kallen-Zury argues that Pasano was ineffective for three reasons: (1) for failing to introduce various documents, (2) for artificially limiting Dr. Danziger's potential testimony due to counsel's Federal Rule of

Criminal Procedure 16 violation[4] and decision to limit the sample size of Dr. Danziger's review to nineteen patients, and (3) for failing to get Kallen-Zury's informed consent before deciding not to call various witnesses at trial.  Unfortunately for Kallen-Zury, the first two issues are outside the certificate of appealability, and the third issue has been waived because she failed to raise it before the district court.

"[I]n an appeal brought by an unsuccessful habeas petitioner, appellate review is limited to the issues specified in the [certificate of appealability]." *Turner v. Sec'y, Dep't of Corr.*, 991 F.3d 1208, 1211 n.1 (11th Cir. 2021) (quoting *Murray v. United States*, 145 F.3d 1249, 1250–51 (11th Cir. 1998)).  The certificate of appealability allowed Kallen-Zury to appeal her claim "that her former trial counsel was ineffective for failing to call any witnesses at trial other than [Kallen-Zury] herself."  The district court expressly limited the scope of the certificate of appealability to the issue of witnesses, not documents.  Therefore, we will not consider Kallen-Zury's arguments about Pasano's failure to introduce various documents at the trial or his decisions affecting the scope of Dr. Danziger's testimony.

---

[4] At trial, the government made a Rule 16 objection to the use of the charts that Dr. Danziger had reviewed, arguing that Pasano failed to disclose them. This objection came after Kallen-Zury rested her case and after Pasano decided not to call Dr. Danziger. The district court ultimately excluded a portion of Dr. Danziger's testimony if Kallen-Zury's co-defendant called him to testify.

Though the argument was not included in the § 2255 motion, on appeal, Kallen-Zury argues that once she and counsel agreed they would present exculpatory witnesses, counsel needed her informed consent not to call them. She claims that counsel's performance was deficient for failing to get such consent. This argument might require us to decide as a matter of first impression whether the decision to call witnesses at trial belongs to the lawyer or the client. But "we have repeatedly held that 'an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court.'" *Walker v. Jones*, 10 F.3d 1569, 1572 (11th Cir. 1994) (citation omitted). For this reason, we will not consider Kallen-Zury's arguments about Pasano's failure to get her informed consent not to call any fact witnesses other than Kallen-Zury herself.

With these procedural issues resolved, we turn to the merits of Kallen-Zury's ineffective assistance claim.

### B.    *Strickland* Analysis

To prevail on an ineffective assistance of counsel claim, a petitioner must "demonstrate both that (1) 'counsel's performance was deficient,' and (2) 'the deficient performance prejudiced the defense.'" *United States v. Webb*, 655 F.3d 1238, 1258 (11th Cir. 2011) (quoting *Strickland*, 466 U.S. at 687). "We may consider the prongs of the *Strickland* test in either order, and the defendant must show that both prongs are satisfied in order to demonstrate a Sixth Amendment violation." *Id.* (citation omitted). This standard is necessarily a fact-intensive one, requiring a court to "consider[] all

the circumstances" when evaluating counsel's performance. *Strickland*, 466 U.S. at 688. If a defendant makes an insufficient showing on one of the requisite prongs, we need not address the other prong. *Id.* at 697; *Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1100 (11th Cir. 2007) (citation omitted).

To establish prejudice under the second prong of *Strickland*, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In other words, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must show instead that counsel's deficient representation rendered the result of the trial unfair. *See id.* at 697. The prejudice component of the *Strickland* standard thus reflects "[t]he purpose of the Sixth Amendment guarantee of counsel," which is to "ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Id.* at 691–92. This Court has recognized that, given the principles and presumptions associated with ineffective assistance claims, "the cases in which habeas petitioners can properly prevail are few and far between." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (ellipsis omitted) (quoting *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc)).

*Strickland* prejudice presents a mixed question of law and fact, making our review plenary. *See, e.g., Brooks v. Comm'r, Ala.*

*Dep't of Corr.*, 719 F.3d 1292, 1300 (11th Cir. 2013).  Underlying factual determinations, however, are subject to clear error review. *See Devine*, 520 F.3d at 1287.

Here, we conclude that the district court did not err in determining Kallen-Zury did not suffer prejudice.  The district court found that her proposed witnesses were either credible but could not offer valuable testimony, or were not credible, and so their testimony would not have changed the outcome of the trial.  We also conclude that the magistrate judge's thorough factual findings set forth in the report and recommendation, which were adopted by the district court, are not clearly erroneous, especially given the substantial deference we afford to the factfinder as to credibility determinations.  *See Devine*, 520 F.3d at 1287.  We briefly discuss each proposed witness in turn.[5]

Wagie, although credible according to the magistrate judge, was not at HP during the key period in this case, had no knowledge of HP's accounting or marketing operations, and exhibited bias in favor Kallen-Zury.  The combination of her lack of first-hand knowledge and exhibited bias led the magistrate judge to discount her potential testimony.  Given her lack of firsthand knowledge on the critical issues of the case and her bias, it was not error  to find

---

[5] Because we conclude that Kallen-Zury did not establish prejudice under *Strickland*, we need not determine whether the district court correctly determined that her counsel did not exhibit deficient performance. *See Strickland*, 466 U.S. at 697.

that Wagie's testimony would not have resulted in a different outcome at trial.

Davidson, while credible in the eyes of the magistrate judge, would not have provided valuable testimony, as the financial chart he would testify about was introduced by Pasano to avoid the risks of cross-examination. The only other testimony Davidson had to offer was his statement that the money Kallen-Zury received came from sources other than HP. But Davidson admitted at the evidentiary hearing that all the payments made to Kallen-Zury came from HP's bank account, not the nursing home's account or any other account. Regardless of how money was moving in the background, the money paid to Kallen-Zury came from HP. Thus, it was not error to conclude that this testimony would not have changed the outcome of the trial.

The magistrate judge determined that Rosier was not credible, as she tried to justify the practice of signing blank treatment forms after saying such practices were unacceptable. During her cross-examination at the evidentiary hearing, she stated that doctors should not sign blank treatment forms. But when she was presented with three separate documented instances of this happening at HP, she came up with implausible excuses for each example, such as the doctor probably knew the treatment in his head, even though she had no knowledge of the specific doctor in that case. Her lack of credibility would not have persuaded a reasonable jury.

Danzig seemed mostly interested in justifying his handling of the government subpoena, and so the magistrate judge found

his testimony was colored by self-interest.  Given this, the magistrate concluded that his testimony was not valuable.  Even if the jury determined Danzig were not testifying out of self-interest, all he would have told the jury was that Kallen-Zury used lawyers at Danzig's firm to comply with the government subpoena.  But the jury knew this information already, as the government presented documents showing the law firm's involvement, Kallen-Zury also testified to that fact, and Pasano reiterated this during closing arguments.  Therefore, Danzig's testimony would have been cumulative and would not contradict the facts underlying Kallen-Zury's crimes.

As for Hunter, we already concluded, in *Kallen-Zury II*, that neither his testimony about Kallen-Zury's role with respect to the patient register—nor his testimony contradicting Gloria Himmons's trial testimony—would've impacted the outcome of Kallen-Zury's trial. 710 F. App'x at 370–73.  What's more, the magistrate judge found his testimony at the evidentiary hearing to be inconsistent and lacking in credibility.  Hunter's claim that he would have testified at Kallen-Zury's trial was contradicted by the fact he invoked his Fifth Amendment rights before the grand jury.  Additionally, the magistrate judge believed Hunter "had an obvious axe to grind against the government after having been prosecuted and acquitted in a parallel case," further reducing his credibility.  Hunter was uncooperative and contradictory in his cross-examination during the evidentiary hearing.  For instance, he denied that Himmons, a recruiter for HP, actually sent patients to

HP, but admitted she was a referral source.  Then, after admitting he did not work with Dr. Gumer—a former HP doctor and government witness—or know what Dr. Gumer did with patients, Hunter said that Dr. Gumer was lying when he admitted to falsifying patient records at trial.  When shown multiple duplicate invoices submitted to or by HP, Hunter claimed the records did not seem odd to him.  Hunter was also unconcerned over a letter he was shown from a doctor at HP that outlined three practices the doctor thought were illegal, because according to Hunter, that was just what the doctor believed.  Hunter admitted on cross-examination that HP tracked referrals "indirectly" but claimed this tracking was "not really" important.  He later contradicted himself by admitting that the tracking was important to HP.  We thus conclude that the district court's ruling as to this witness was not erroneous.

As to Dr. Danzinger, his testimony, although found to be credible, was of little value according to the magistrate judge, given that he analyzed only nineteen of the thousands of patients at HP during the period in question.  Additionally, his analysis assumed the veracity of the treatment forms, even though he had no corroboration for such an assumption.  Given this limited sample size, and the fact that the key issue in the case came down to Kallen-Zury's credibility with the jury, there is no reasonable probability that Dr. Danziger's testimony would have led to a different outcome.

The testimony from these witnesses—taken together or separately—would not have created a reasonable probability that

Kallen-Zury's trial would have resulted in a different outcome—especially given the deferential standard we afford to credibility determinations of witnesses by the factfinder, in this case the magistrate judge. *See McPhee*, 336 F.3d at 1275 ("[W]e allot substantial deference to the factfinder . . . in reaching credibility determinations with respect to witness testimony." (quoting *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1285–86 (11th Cir. 2000))). The magistrate judge conducted three full days of evidentiary hearings, listening to the testimony that each proposed witness would have given at Kallen-Zury's trial. The magistrate judge made certain credibility determinations that were reasonable based on our review of the transcripts, and we will not second guess those determinations here. Based on those determinations, the magistrate judge found that the proposed witnesses would not have changed the outcome of the trial. The district court adopted those findings and conclusions, and we cannot conclude that this was error.

Kallen-Zury's proposed witnesses would have been of limited value to her defense, especially considering the weight of evidence against her presented during the five-week trial. At a trial where the key issue became her credibility, Kallen-Zury's testimony contradicted the testimony of several government witnesses on a number of points. There were several discrepancies between Kallen-Zury's testimony and the testimony of other witnesses (including three patient recruiters and two of Kallen-Zury's own employees), which were sufficient to damage her credibility in the jurors' eyes. And so, she cannot show that she was prejudiced by

Pasano's failure to call these witnesses at trial and therefore cannot satisfy the second *Strickland* prong. *See Strickland*, 466 U.S. at 694. Thus, her ineffective assistance of counsel claim must fail.

## IV.    CONCLUSION

For all these reasons, we conclude that the district court did not err in concluding that the testimony of the proposed witnesses would not have changed the outcome of the trial. As a result, Kallen-Zury was not prejudiced by her counsel's decision not to call those witnesses at trial. We therefore affirm the denial of her § 2255 motion.

**AFFIRMED.**